# EXHIBIT A

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of August __, 2012, by and among Peoplelink, LLC, an Indiana limited liability company ("Buyer"), Elite Personnel Inc., a New Jersey corporation ("Seller"), and Joseph G. Straining and Barbara Straining, each a shareholder of Seller (each individually an "Owner" and, together, "Owners"). Buyer, Seller and Owners are sometimes collectively referred to herein as, "Parties" and individually as, a "Party".

## RECITALS

WHEREAS, Seller provides temporary staffing services, including but not limited to temporary, temp-to hire, direct hire, managed service and long-term staffing services, recruiting and placement services, background checking services and skills assessment services (the "Business") throughout the State of New Jersey from its principal office located at 933 Route 23 South, Pompton Plains, New Jersey 07444 (the "Office").

WHEREAS, Buyer desires to purchase substantially all of the assets of the Business from Seller, and Seller desires to sell such assets, on the terms and subject to the conditions contained in this Agreement.

## 1.   PURCHASE OF ASSETS

Section 1.01.   Assets Purchased from Seller.   Seller shall sell and deliver to Buyer, and Buyer shall purchase and accept delivery from Seller free and clear of any lien, encumbrance or restriction, except as otherwise set forth herein, all of the assets, properties and rights of Seller related to the Business existing as of the Closing Date other than the Excluded Assets described in Section 1.02 (the "Purchased Assets"), wherever situated, including but not limited to:

(a)   Work in Process.   All amounts billable to customers for work performed by employees of Seller through the Closing Date which remain unbilled as of the Closing Date ("Work in Process").  A correct and complete list of such Work in Process as of the Closing Date, setting out hours by employee for each customer, will be attached hereto at the Closing as *Schedule 1.01(a)*.  In the interest of clarity, Work in Process shall not include any work performed by temporary employees for which such temporary employees have been fully paid by Seller, but for which work customers may not have been billed by Seller as of the Closing Date [by way of example, Work in Process would not include work billed by Seller to its customer on September 11, 2012 (assuming Closing took place on September 10, 2012) for which Seller's temporary employees were paid on September 10, 2012].

(b)   Tangible Personal Property.   All tangible personal property, furniture, office equipment, computer equipment, fixtures and leasehold improvements, owned by Seller and used in conducting the Business.

(c)     Intangible Assets.  All intangible personal property of Seller used in conducting the Business, including but not limited to, all confidential information and trade secrets, customer lists (together with all documents, records, files, computer tapes or discs, or other media on or in which the same may be evidenced or documented), trade lists, trade names, telephone numbers, software, books and records ("Intangible Assets").

(d)     Licenses and Permits.  All of Seller's rights in any state and local government licenses, service provider identification numbers, approvals, permits and authorizations (and any applications for the foregoing) used in the Business (the "Licenses").

(e)     Customer Contracts and Purchase Orders.  All of Seller's rights under open contracts and purchase orders from customers of the Business in effect on the Closing Date and listed on *Schedule 1.01(e)*.

(f)     Office Lease.  All rights of Seller under the leases listed on *Schedule 1.01(f)* for office space for the Office (the "Office Lease").

(g)     Claims.  All of Seller's claims (other than claims for accounts receivable), deposits, causes of action, chooses in action, rights of recovery, rights of set off and rights of recoupment.

(h)     Goodwill.  The goodwill of Seller relating to the Business.

Section 1.02.  Excluded Assets.  Notwithstanding the foregoing, the following assets are not included in the Purchased Assets and shall be retained by Seller ("Excluded Assets"):

(a)     Cash and Cash Equivalents.  All cash and cash equivalent items of Seller, including, without limitation, checking accounts, bank accounts, certificates of deposit, time deposits and securities, including uncashed checks received by Seller on or prior to the Closing Date, in each case whether or not relating to the Business;

(b)     Accounts Receivable.  The accounts receivable of Seller;

(c)     Corporate Items.  Seller's corporate charter, qualifications to conduct business, arrangements with registered agents relating to qualifications to conduct business, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates, and other documents relating solely to the organization, maintenance and existence of Seller;

(d)     Tax Refunds.  Seller's rights to or claims for refunds or rebates of taxes and other governmental charges for periods ending on or prior to the Closing Date and the benefit of net operating loss carryforwards, carrybacks or other credits of Seller, whether or not attributable to the Business; and

(e)     Insurance Policies.  All of Seller's insurance policies and rights thereunder, including but not limited to, rights to any rebates and/or cancellation value as of the Closing Date.

2

based on number of months Buyer owned the Business at the time the holiday or vacation occurs, as it relates to temporary employees who were employed by Seller on the Closing Date, *provided that*, Seller will be responsible for any third (3rd) quarter Quarterly Vacation Awards and Buyer will be responsible for any fourth (4th) quarter Quarterly Vacation Awards.  Within a reasonable time following December 31, 2012, Buyer will provide Seller with a detailed schedule of the Annual Vacation Awards paid by Buyer relating to 2012.  Within thirty (30) days of receiving the schedule, Seller shall remit payment to Buyer for fifty percent (50%) of the amount paid by Buyer for the Annual Vacation Awards.

## 2.    PURCHASE PRICE

Section 2.01.  <u>Purchase Price; Closing Payment</u>.  In consideration of the Purchased Assets, Buyer shall pay Seller Six Million Four Hundred Thousand and no/100ths Dollars ($6,400,000.00) in the form of the Closing Payment, the Escrowed Funds and the Note (each as defined below) (collectively, the "Purchase Price").  Buyer will pay Seller Three Million Eight Hundred Eighty Thousand and no/100ths Dollars ($3,880,000.00) (the "Original Closing Payment Amount"), less the amount of the Escrowed Funds, at Closing in cash by wire transfer (the "Closing Payment").

Section 2.02.  <u>Promissory Note</u>.

(a)    At the Closing, Buyer shall execute and deliver to Seller a promissory note (the "Note") substantially in the form attached hereto as **<u>Exhibit A</u>** in the principal amount of Two Million Five Hundred Twenty Thousand and 00/100ths Dollars ($2,520,000.00), which shall be payable, with interest at a rate of Three Percent (3.00%) per annum thereon, in eight (8) equal quarterly installments of Three Hundred Fifteen Thousand and 00/100ths Dollars ($315,000.00) commencing May 25, 2013.  Buyer's obligations under the Note will be guaranteed by its U.S. parent company, CRIT Corp., a Delaware corporation.

(b)    The principal amount of the Note will be reduced, as of the end of each Measurement Period (as defined below), by an amount equal to sixty percent (60%) of any amount by which the Margin (as defined below) for the Business as billed by Buyer during each of two (2) twelve-month Measurement Periods (as defined below) following the Closing is less than ninety-five percent (95%) of the Target Margin for the corresponding twelve-month period.   For purposes of this Agreement: (i) "Margin" during any Measurement Period will mean amounts actually billed by Buyer during that Measurement Period, less wages for temporary employees, employment taxes thereon, and costs of worker's compensation insurance (*provided*, if and when any amount billed is written off as an uncollectible bad debt, such amount billed but not collected will be subtracted from Margin, and the deductions associated with that revenue for wages for temporary employees, employment taxes thereon, and costs of worker's compensation insurance, will be added back to Margin); (ii) "Measurement Period" will mean the twelve month period beginning each October 1 and ending on September 30 of the next calendar year; (iii) "Target Margin" will mean: (a) as it relates to the Measurement Period ending on September 30, 2013, Two Million Four Hundred Thousand Dollars ($2,400,000.00); (b) as it relates to the Measurement Period ending on September 30, 2014, Two Million Five Hundred Twenty-Eight Thousand Dollars ($2,528,000.00).

4

(c)     Margin will include margins collected for revenues of current or future Buyer's offices in addition to the current Seller office where Seller has initiated the revenues to Buyer through relationships with Seller's customers, rather than through Buyer's independent (or common) relationships or independent efforts.

(d)     The principal amount of the Note will be increased, as of the end of each Measurement Period, by an amount equal to twenty-five percent (25%) of any amount by which the Margin for the Business as billed by Buyer during each of two (2) twelve-month Measurement Periods (as defined above) following the Closing is greater than one hundred-five percent (105%) of the Target Margin for the corresponding twelve-month period.

(e)     Buyer will provide Seller with written notice of any proposed adjustment to the Note not less than thirty (30) days prior to the date on which the applicable quarterly payment of the Note is due and payable, together with a description (in reasonable detail) as to the basis for any proposed adjustment.  In the event that Seller provides written notice to Buyer of an objection to all or any portion of the proposed adjustment to the Note, including a description (in reasonable detail) of the basis for Seller's objection within ten (10) business days after the date of Buyer's notice of proposed adjustment, then on the date of the quarterly Note payment that month, Buyer will deposit in a separate account (the "Segregated Account") any portion of amount then due and payable on the Note if the adjustment (or portion thereof) objected to by Seller were not to be made.  The objection will be resolved in the manner set out in Section 2.02(f) below and the amount so deposited will be released to Buyer or Seller when the objection is so resolved.

(f)     Buyer and Seller will discuss in good faith any objection by Seller to any adjustment to the Note proposed by Buyer, will exchange information relating to Seller's objection and the proposed adjustment, and will within thirty (30) days meet in person or via teleconference to discuss resolving the objection.  At any time after thirty (30) days following the date of Seller's objection, either Party may request that the proposed adjustment and Seller's objection thereto be submitted to the accounting firm of McGladrey LLP (the "Accounting Firm").  The Accounting Firm will be provided with access to the relevant books and records of Buyer and will provide its determination to Buyer and Seller within sixty (60) days.  The determination of the Accounting Firm as to any proposed adjustment shall be binding upon Buyer and Seller and any proposed adjustment shall continue to bear interest as provided for under the Note.

(g)     The responsibility for the fees and expenses of the Accounting Firm shall be borne by Buyer and the Seller in the following manner: (i) the Seller's calculation of the proposed adjustment shall be referred to as the "Seller's Amount"; (ii) the Buyer's calculation of the proposed adjustment shall be referred to as the "Buyer's Amount"; (iii) the difference (in absolute terms) between the Seller's Amount and the Buyer's Amount shall be referred to as the "Disputed Amount"; (iv) Buyer shall bear the fees and expenses of the Accounting Firm in the same proportion that the difference (in absolute terms) between the Buyer's Amount and the adjustment as determined by the Accounting Firm bears to the Disputed Amount; and (v) the Seller shall bear the fees and expenses of the Accounting Firm in the same proportion that the difference (in absolute terms) between the

Seller's Amount and the adjustment as determined by the Accounting Firm bears to the Disputed Amount. Following the determination of the adjustment by the Accounting Firm, each of Buyer and Seller agrees to pay to the other (or to the Accounting Firm, to the extent not previously paid) such amount as shall be necessary to cause the fees and expenses of the Accounting Firm to be borne by Buyer and the Seller in accordance with this sub-section.

Section 2.03.  New Jersey Tax Escrow.  Buyer and Seller have received that certain notice issued by the New Jersey Division of Taxation, dated August 30, 2012 (the "NJ Tax Notice"), asserting a lien in the amount of Five Hundred Ninety Thousand and no /100 Dollars ($590,000). At Closing, Buyer shall deduct from the Original Closing Payment Amount, an amount equal to One Hundred Eighty Thousand and no/100 Dollars(the "NJ Tax Escrow"), which amount Seller represents to Buyer Seller understands, based on conversations with representatives of the New Jersey Division of Taxation, to be the amount the New Jersey Division of Taxation currently asserts to be the amount of its lien (the "Escrowed Funds") and place the Escrowed Funds into a segregated account with Buyer, pending Seller's resolution of the tax matters before the State of New Jersey in a manner which does not result in any lien upon the Purchased Assets. Buyer shall release to Seller within five (5) days  after receiving a tax clearance letter issued by the State of New Jersey, all Escrowed Funds.

Section 2.04.  Allocation.   At the Closing, Buyer and Seller will agree upon an allocation of the Purchase Price on IRS Form 8594 attached hereto as **Exhibit B** (the "Allocation"). Buyer and Seller will not report any allocation of the Purchase Price for federal, state and local income tax purposes inconsistent with the Allocation.

3.     **BUYER'S REPRESENTATIONS AND WARRANTIES.** Buyer represents and warrants to Seller as follows:

Section 3.01.  Organization, Standing and Power.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Indiana.  At Closing, Buyer will have all requisite power and authority to own, lease and operate properties used by the Business, to carry on the Business (as presently being conducted), including being qualified as a foreign limited liability company to do business in, and in good standing under the laws of, the State of New Jersey, and to execute, deliver and perform this Agreement and all documents entered into in connection with this Agreement (the "Transaction Documents") relating thereto.

Section 3.02.  Authorization of Buyer.  The execution, delivery and performance of the Transaction Documents and all obligations relating thereto by Buyer have been duly and validly authorized.  This Agreement has been duly and validly executed and delivered by Buyer and constitutes, and Transaction Documents relating thereto, upon its execution and delivery by Buyer, will constitute a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

Section 3.03.  Noncontravention.  Neither the execution and delivery by Buyer of this Agreement or any of the Transaction Documents, nor the consummation by Buyer of the transactions contemplated hereby or thereby, will (i) conflict with or violate any provision of the

6

Articles of Organization or Operating Agreement of Buyer, (ii) require on the part of Buyer any notice to or filing with, or any permit, authorization, consent or approval of, any governmental authority, (iii) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party the right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which Buyer is a party, by which Buyer is bound or to which any of its assets is subject (other than the consent of Buyer's commercial lender), or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to Buyer.

4. **SELLER'S REPRESENTATIONS AND WARRANTIES.** Seller and Owners each jointly and severally represents and warrants to Buyer as follows:

Section 4.01. Organization, Standing and Power. Seller is a duly incorporated and validly existing corporation formed under the laws of the State of New Jersey as to which Seller and the Owners have duly elected status for federal and state income tax purposes under Subchapter 'S' of the Internal Revenue Code. Seller's assets and the conduct of the Business do not require that it be qualified as a foreign corporation to do business in any state. Seller has all requisite power and authority to own, lease and operate properties used by the Business, to carry on the Business (as presently being conducted), and to execute, deliver and perform this Agreement and the Transaction Documents. Seller and Owners have no affiliated entities and have not conducted any business similar to the Business through any entity other than Seller.

Section 4.02. Authorization of Seller. The execution, delivery and performance of this Agreement and the Transaction Documents have been duly and validly authorized by the Owners and the Board of Directors of Seller, which are the only approvals required by Seller's Certificate of Incorporation, or By-Laws, or any other applicable agreement, order or statute. This Agreement has been duly and validly executed and delivered by Seller and constitutes, and each writing relating hereto or delivered to Buyer in connection herewith, upon its execution and delivery by Seller, will constitute a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

Section 4.03. Noncontravention. Neither the execution and delivery by Seller of this Agreement or any writings related hereto, or delivered to Buyer in connection herewith, nor the consummation by Seller of the transactions contemplated hereby or thereby, will (i) conflict with or violate any provision of the Certificate of Incorporation and By-Laws of Seller, (ii) require on the part of Seller any permit, authorization, consent or approval of, any governmental authority, (iii) except as set forth in *Schedule 4.03* attached hereto, conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party the right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which Seller is a party, by which Seller is bound or to which any of the Purchased Assets is subject, (iv) result in the imposition of any security interest mortgage or lien upon any of the Purchased Assets, other than the NJ Tax Escrow, or (v) violate any order, writ, injunction, decree, statute, rule or regulation applicable to Seller or any of the Purchased Assets.

7

Section 4.04.   Liabilities.   Except for the liabilities listed on *Schedule 4.04* attached hereto and liabilities arising after the date of this Agreement in the ordinary course of business, Seller has no outstanding liabilities to any persons or entities with respect to the Business.

Section 4.05.   Tax Matters.   All federal, state and local returns and tax reports (including but not limited to with respect to employment related taxes and withholdings), required to be filed with respect to the Business or Seller and which are due by the Closing Date, have been filed with the appropriate governmental agencies in all jurisdictions in which such returns and reports are required to be filed.   All such federal, state and local returns and tax reports are true, correct and complete in all material respects, and all amounts shown as owing thereon (including but not limited to with respect to employment related taxes and withholdings) have been paid.   Seller has paid or will pay in full at federal, state and local taxes payable with respect to the Business or Seller for periods prior to the Closing Date.   Seller has not received any written notice of deficiency or seeking to impose additional taxes from any taxing or other governmental authority.

Section 4.06.   Title to Property and Related Matters.   Seller has good and marketable title to all of the Purchased Assets, free and clear of all security interests, liens, pledges, claims, charges, escrows, encumbrances, options, rights of first refusal, mortgages, indentures, easements, licenses, security agreements or other agreements, arrangements, contracts, commitments, understandings or obligations except as described on *Schedule 4.06* attached hereto, all of which will have been released at or prior to Closing, except for the NJ Tax Escrow.

Section 4.07.   Agreements, Etc.   *Schedule 4.07* attached hereto lists and briefly describes all contracts (written or oral), agreements and other arrangements (if any) relating to the Purchased Assets or the Business having a value in excess of $10,000.   Seller is not in default under any contract, agreement or arrangement listed on *Schedule 4.07* and, to Seller's knowledge, no third party is in default under any contract, agreement or other arrangement listed on *Schedule 4.07*. Each contract, agreement or arrangement is enforceable by Seller in accordance with its terms. Seller has provided to Buyer complete and correct copies of all written contracts, agreements and arrangements (and complete and accurate summaries of all oral ones).

Section 4.08.   Litigation, Etc.   Except as set forth on *Schedule 4.08* attached hereto, there are no actions, suits, claims, investigations or legal or administrative or arbitration proceedings pending or threatened in writing against Owners or Seller relating to the Purchased Assets, the liabilities listed on *Schedule 4.04* or the Business, whether at law or in equity, or before or by any federal, state, municipal or other governmental instrumentality and, to Seller's and Owners' knowledge, there is no basis for any such claim.

Section 4.09.   Compliance; Governmental Authorizations.   Owners and Seller are each in compliance with all federal, state, local or foreign laws, ordinances, regulations and orders applicable to the Business or the Purchased Assets.   Seller has all of the Licenses necessary to operate the Business (a list of which is set forth on *Schedule 4.09* attached hereto) and the Licenses are in full force and effect, and no violations are or have occurred in respect of any thereof, and no proceeding is pending or threatened to revoke or limit any thereof.

Section 4.10.   Purchased Assets.   *Schedule 4.10* attached hereto lists each item of tangible personal property, furniture, equipment, fixtures, leasehold improvements, and software used in

the operation of such equipment, furniture, fixtures, leasehold improvements, and other tangible personal property of Seller used in the Business. The Purchased Assets are sufficient for the conduct of the Business as presently conducted and constitute all of the assets used by Seller in the Business, including all assets transferred to Seller and previously used by any affiliates of Seller or of Owners to conduct the Business. Each tangible Purchased Asset is free from material defects, is in good operating condition and repair (subject to normal wear and tear) and is suitable for the purposes for which it presently is used.

Section 4.11.   Intellectual Property.   Except as listed on *Schedule 4.11* attached hereto, there is no Intellectual Property needed or currently used by Seller in the operation of the Business. For the purposes of this Agreement, Intellectual Property means whether protected, created or arising under the Laws of the United States or any other foreign jurisdiction: (i) trademarks, service marks, trade dress, logos, trade names, internet domain names, corporate names, together with the goodwill associated with all of the foregoing, and registrations and applications for registration thereof, (ii) copyrights, mask work rights and registrations and applications for registration thereof, (iii) trade secrets, (iv) computer software and (v) other similar proprietary rights. Seller's use of the Intellectual Property in the operation of the Business has not and does not infringe the rights of any person, and no other person has any right to use or has claimed any right to use the Intellectual Property listed on *Schedule 4.11*.

Section 4.12.   Financial Information.   Seller has provided Buyer with balance sheets of Seller as of December 31, 2010 and 2011 and as of June 30, 2012, together with statements of their operations for each month during 2010, 2011 and 2012 (the "Financial Statements"). The Financial Statements have been prepared from the books and records of Seller in accordance with GAAP consistently applied and maintained throughout the periods indicated (except as otherwise disclosed on *Schedule 4.12*), fairly state Seller's financial condition as of the balance sheet dates and correctly, completely and accurately sets forth in all material respects the revenues and expenses of the Business, includes all of the Business conducted by Seller and fairly present the information used to calculate the Target Margin for the twelve-month period from (and including) July, 2011 through (and including) June, 2012 .

Section 4.13.   Absence of Certain Changes.   Since December 31, 2011, other than the NJ Tax Notice, there has occurred no event or development which, individually or in the aggregate, has had, or could reasonably be expected to have in the future, a Material Adverse Effect on Seller or the Business or the Purchased Assets. Since December 31, 2011 Seller has conducted the Business only in the ordinary course, consistent with Seller's past practices. "Material Adverse Effect" shall mean any material adverse change, event, circumstance or development with respect to, or material adverse effect on, (i) the Purchased Assets or (ii) the Business. To the knowledge of Seller and Owners, since December 31, 2011, other than the NJ Tax Notice, there has occurred no event or development which, individually or in the aggregate, has had, or could reasonably be expected to have in the future, a material adverse change, event, circumstance or development with respect to, or material adverse effect on the performance or prospects of the Business after Closing.

Section 4.14.   Employees.   There are no material controversies pending or, to Seller's knowledge, threatened between Seller and any of its employees (whether staff or temporary), including, without limitation, any charges relating to discrimination, violations of the National Labor Relations Act, wage or hour claims, occupational safety and health claims, workers'

compensation claims or claims relating to wrongful termination of employment or other violations of rights. _Schedule 4.14_ sets forth the names, hire dates and current wage rates of all of Seller's staff employees.

Section 4.15.   Employee Benefit Plans.

(a)      _Schedule 4.15_ contains a true and complete list of all plans, agreements and arrangements with respect to the compensation or benefits for Seller's employees ("Employee Benefit Plans"). All Employee Benefit Plans comply in all material respects with all applicable provisions of ERISA, the Code, and other laws applicable thereto.

(b)      Seller is not part of a controlled group of employers with any other person (as defined in Section 770l(a)(l) of the Code) that is considered a single employer under Sections 414(b), (c), (m), or (o) of the Code, or Section 3(5) or 4001(b)(1) of ERISA, or the regulations promulgated thereunder.

(c)      Seller currently does not and is not required to (and never has or been required to) sponsor, maintain, contribute to, and none of Seller's employees is a participant in, any "multi-employer plan" within the meaning of Section 3(37) or 4001(a)(3) of ERISA. Seller has no liability of any nature, whether known or unknown, fixed or contingent, with respect to any such multi-employer plan.

(d)      Seller does not sponsor, maintain, contribute to, and is not required to contribute to, any medical, health, life or other welfare benefits for present or future terminated employees or their spouses or dependents, other than as required by Part 6 of Subtitle B of Title I of ERISA or any comparable state law.

(e)      Seller is not, and never has been, obligated to contribute to any Employee Benefit Plan subject to Title IV of ERISA.

(f)      Seller has made all contributions and other payments that it has been required to make to any Employee Benefit Plan.

Section 4.16.   No Misleading Statements.   Neither this Agreement (including the Exhibits and Schedules hereto), nor any certificate or other document delivered by Seller in connection herewith contains, or will contain when delivered, any untrue statement of a material fact or omits to state, or will omit to state when delivered, a material fact necessary in order to make the statements made herein or therein (or in any such Exhibit or Schedule, or any such certificate or other document), in light of the circumstances under which they were made, not misleading.

## 5.   CLOSING

Section 5.01.   Closing.   The closing of the transaction contemplated by this Agreement (the "Closing") shall be held at the offices of Buyer's counsel, Barnes & Thornburg LLP, 600 1st Source Bank Center 100 North Michigan, South Bend, Indiana, on Monday, September 10, 2012, at 10:00 a.m.(Eastern Standard Time), or on such other date and time as the Parties may mutually agree upon in writing, but in no event later than September 24, 2012 (the "Closing Date"), effective as of 12:01 a.m. (Eastern Standard Time) on the Closing Date; provided, that the Seller

need not be present at the Closing, and each Party may deliver electronic versions of signed documents to be delivered at the Closing, followed by overnight delivery of the original documents to the other Party.

Section 5.02.   <u>Conditions to Obligations of Buyer to Proceed on the Closing Date</u>.   The obligation of Buyer to proceed on the Closing Date shall be subject to the satisfaction, on or before the Closing Date, of the following conditions:

(a)    Truth of Representations and Warranties and Compliance with Obligations. The representations and warranties of Seller herein contained shall be true in all material respects on the Closing Date with the same effect as though made at such time.   Seller shall have performed all material obligations and complied with all material covenants and conditions prior to or as of the Closing Date.

(b)    Release of Secured Interests.   Seller shall have delivered to Buyer a statement or statements in form and content reasonably satisfactory to Buyer evidencing the termination of all liens, claims, and encumbrances in and to the Purchased Assets, except for the NJ Tax Escrow; alternatively, Seller shall have delivered to Buyer written evidence in form and content reasonably satisfactory to Buyer evidencing the absence of such liens, claims, and encumbrances.

(c)    Assignments.   Seller shall have executed and delivered to Buyer documents assigning all of its right, title, and interest in the Purchased Assets, free and clear of all liens, encumbrances, and third-party claims or interests of any kind whatsoever, except for the NJ Tax Escrow.

(d)    Required Consents.   Seller shall have obtained the consent or approval of the lessor under the Office Lease.

(e)    Officers' Certificates.   Seller shall have executed and delivered to Buyer certificates, effective as of Closing, (i) from its President, certifying that the representations and warranties of Seller herein contained are true and correct in all material respects, and that all conditions herein contained have been fulfilled, and (ii) from its Secretary, certifying as to the incumbency of the Seller's officers, respectively, the authenticity of the resolutions or consents authorizing the transactions contemplated by the Agreement and the authenticity and continuing validity of the Seller's Certificate of Incorporation and By-Laws (a copy of which certificates are attached hereto as **<u>Exhibit C</u>**).

(f)    Staff Employees.   Buyer shall have entered into an employment agreement (including restrictive covenants) with Christopher J. Vecchiarelli in form and substance acceptable to Buyer (a copy of which agreement is attached hereto as **<u>Exhibit D</u>**) and each of Seller's current active staff employees listed on *<u>Schedule 5.02(f)</u>* attached hereto shall have executed a confidentiality agreement (including restrictive covenants) in form and substance acceptable to Buyer.

(g)    Customer Interviews.   Buyer shall have completed discussions with Seller regarding Seller's key customers (listed on *<u>Schedule 5.02(g)</u>* attached hereto) and be

reasonably satisfied that no such customer contemplates terminating its relationship with the Business as a result of the Closing of the transactions contemplated hereby.

(h)     Delivery of Documents.  Seller shall have delivered such other documents as Buyer reasonably may request to carry out the transactions contemplated under this Agreement.

Section 5.03.  <u>Conditions to Obligation of Seller to Proceed on the Closing Date</u>.  The obligation of Seller to proceed on the Closing Date shall be subject to the satisfaction, on or before the Closing Date, of the following conditions:

(a)     Truth of Representations and Warranties and Compliance with Obligations. The representations and warranties of Buyer herein contained shall be true in all material respect on the Closing Date with the same effect as though made at such time.  Buyer shall have performed all material obligations and complied with all material covenants and conditions prior to or as of the Closing Date.

(b)     Closing Payment.  Buyer shall have paid to Seller the Closing Payment.

(c)     Delivery of Documents.  Buyer shall have delivered the Note and such documents as Seller reasonably may request to carry out the transactions contemplated under this Agreement.

(d)     Staff Employees.  Buyer shall have offered employment to those staff employees listed on Schedule 5.02(f) attached hereto at compensation substantially the same as their current compensation from Seller and with employee benefits offered by Buyer to its employees.

## 6.     OTHER AGREEMENTS

Section 6.01.  <u>Pre-Closing Agreements of Seller and Owners</u>.  At all times prior to the Closing Date, Seller will, and Owners will cause Seller to, (i) afford Buyer and its representatives access during non-business hours upon prior reasonable written notice at Seller's principal business office to the assets, data, books, facilities and records (including those of its advisors, accountants, attorneys, etc.) relating to Seller for the purpose of permitting Buyer and its representatives to conduct a thorough due diligence investigation and review of Seller's legal, operational and financial condition (the "Diligence Investigation"); (ii) instruct Seller's commercial lenders to provide Buyer with all requested information; (iii) cooperate with Buyer to permit Buyer to obtain directly from appropriate taxing authorities information as to payroll and other taxes payable by Seller; (iv) not, directly or indirectly, solicit or engage in discussions or negotiations with, or provide any nonpublic information to, or otherwise cooperate with, any person or entity which seeks to acquire or expresses an interest in acquiring all or any part of Seller or their business or assets, or to enter into any transaction inconsistent with the proposed transaction contemplated herein; (v) immediately notify Buyer and provide Buyer with a copy of any expression of interest from a third party after July 19, 2012 regarding any transaction that is inconsistent with the transactions contemplated by this Agreement received (whether or not in writing) by Owners or Seller, (vi) notify any Person who has expressed an interest after July 19, 2012, in acquiring all or any part of Seller or the Business or Purchased Assets or with whom

Seller (or its agent) or Owners have been discussing such a transaction that Owners and Seller have entered into a definitive agreement to sell the Business; and (vii) operate the Business in the ordinary course, consistent with past practice, and, refrain from any transactions outside the ordinary course of business or which would have a Material Adverse Effect on the value of Seller or the Business.

Section 6.02.   Pre-Closing Agreements of Buyer.  Buyer will (i) undertake the Diligence Investigation in such a manner as to not unreasonably interfere with the normal conduct of Seller's business; (ii) maintain the confidentiality of nonpublic information of Seller provided to Buyer during the Diligence Investigation, except to the extent that disclosure is reasonably necessary to conclude the transactions contemplated by this Agreement, provided, that Buyer shall have first obtained Seller's prior written consent to such disclosure; and (iii) will not use that information for purposes other than its evaluation of the purchase of assets described herein from Seller.

Section 6.03.   Payment of Debts and Liabilities and Billing for Pre-Closing Services.

(a)   After Closing, Seller shall pay all of its taxes, liabilities, and debts as they become due and payable, except for amounts which Buyer has specifically assumed or amounts which Seller may contest in good faith by appropriate proceeding.

(b)   After the Closing, Seller shall be permitted to bill and collect from Seller's customers for any services rendered to such customers by Seller's temporary employees; provided, however, that Seller paid all required wage, employment taxes thereon, and costs of worker's compensation insurance relating to such services.

Section 6.04.   Seller's Employees.  Prior to Closing, Buyer shall offer to employ from and after the Closing Date all of the current, active, staff employees of Seller, with employee benefits offered by Buyer to its staff employees and at compensation which will initially be substantially the same as their current compensation from Seller, but will be reviewed and adjusted as of January 1, 2013 to be consistent with Buyer's compensation for its other employees. Until the date of the last scheduled payment of the Note, Buyer shall not substantially change the compensation of any employee that was employed by Seller at the time of Closing without the consent of Seller, which consent shall not be unreasonably withheld, delayed or denied.  Seller shall make available to Buyer its employee files so that Buyer may conduct interviews of Seller's employees and shall indicate to all of its employees to when Buyer offers employment that their employment with Seller will terminate on the Closing Date.  For a period of three (3) years after the Closing Date, neither Seller nor Owners (nor any person or entity affiliated with Seller or Owners) will solicit, offer employment to, employ or engage as a consultant or independent contractor, any staff employee of Seller to whom Buyer offers employment prior to the Closing Date.  Nothing herein shall limit Buyer's right to terminate any employee accepting such offer at any time for any lawful reason.

Section 6.05.   Further Documents and Assurances.  At any time and from time to time after the Closing Date, each Party shall, upon request of the other Party, execute, acknowledge, and deliver all such further and other assurances and documents, and will take such action consistent with the terms of this Agreement, as may be reasonably requested to carry out the transactions contemplated herein and to permit each Party to enjoy its rights and benefits

hereunder.  Upon Buyer's request, Seller hereby agrees to prosecute or otherwise enforce in its own name for the benefit of Buyer, any claim, right or benefit transferred by this Agreement that may require prosecution or enforcement in Seller's name.  Any prosecution or enforcement of claims, rights, or benefits under this provision shall be solely at Buyer's expense, unless the prosecution or enforcement is made necessary by a breach of this Agreement on the part of Seller.

Section 6.06.  <u>Seller's Restrictive Covenant</u>.  In order to induce Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, each of Seller and Owners agrees that for a period of three (3) years from and after the Closing Date, neither of them shall, directly or indirectly, whether as an individual, employee, sole proprietor, owner, partner, officer, director, manager, agent, consultant, formal or informal advisor or by or through investment, nor the lending of any form of assistance to, engage in the Staffing Service Business (as defined below) in the States of New Jersey and New York.

Each Owner and Seller agrees and understands that certain of Seller's customers carry on business outside the State of New Jersey in which Seller's office is located on the date of this Agreement and that Buyer currently plans to expand the Business that it will acquire beyond the State of New Jersey to those States which are contiguous or close-by to the States of New Jersey, such as New York and Pennsylvania.  Owners and Seller each further understands that such customers receive Staffing Services Business by and through confidential information which Buyer will acquire for substantial consideration.

As used in this Agreement, the term "Staffing Services Business" means: (i) providing employees to customers to provide staffing help services for short-term and long-term assignments; (ii) providing employees to customers under temporary to permanent arrangements for the customers to eventually hire the employees as the customers' own employees; (iii) providing prospective employees to customers for permanent placement fees; (iv) providing payroll services for customers; (v) providing executive, professional and technical employee search services and outplacement services for customers; and (vi) providing employee screening services for customers.

Section 6.07.  <u>Non-Solicitation</u>.  As further inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, each of Seller and Owners agree that, for a period of three (3) years from and after the Closing Date they shall not, directly or indirectly (whether for and on behalf of themselves or third parties), solicit, or endeavor to receive Staffing Services Business (a) from any person or entity which during the two-year period ending on the Closing Date, Seller had either provided services or solicited for that purpose, or (b) from any parties with respect to whom they acquired confidential information that constitutes one of the assets being acquired under this Agreement by Buyer.

Section 6.08.  <u>Payroll, Disability, Unemployment and Tax Records</u>.  Buyer shall maintain Seller's archived payroll, disability, unemployment and tax records and ABD software until April 16, 2016 (or any longer period of time required by law) and Buyer (through Seller's former employee, Pamela Ellis (or her successor)) shall reasonably cooperate with Seller and Owners in the event of any government proceeding concerning any payroll/wage reporting, disability, unemployment or tax issues.  Thereafter, in the event Buyer determines not to maintain those

payroll, disability, unemployment and tax records and ABD software, it will arrange for the delivery of such records to a location designated by Seller.

Section 6.09.   Collection Matters.

(a)     Seller may pursue collection of any of Seller's accounts receivable amounts existing as of the Closing Date in a manner similar to Seller's historical collection methods (including use of the "Elite Personnel" name, use of "@eliteperson.com" email addresses, and use of Seller's former employee, Pamela Ellis (or her successor)), and all such collected accounts receivable shall be deposited directly into Seller's bank account without any commingling with Buyer's funds; *provided*, that Seller will not refer any account to an outside collection agency or attorney or institute legal action to collect any amount without prior notice to Buyer.

(b)     Beginning on September 24, 2012 through January 25, 2013, Buyer and Seller will prepare a reconciliation showing the accounts receivable relating to work performed prior to the Closing Date collected by each of Buyer and Seller.  Within two (2) days of completing the reconciliation, the party owing funds pursuant to the reconciliation shall pay the other party.

Section 6.10.   Preparation of Tax Returns.  Seller and Buyer agree to furnish or cause to be furnished to one another, upon request, as promptly as practicable, such information and assistance relating to the Business as is reasonably necessary for the filing of all tax returns of or with respect to the Business, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any tax return of or with respect to the U.S. Business

Section 6.11.   Access to Former Business Records; Cooperation in Litigation.  Until April 16, 2016 , Buyer will retain all records relating to the Business delivered by Seller to Buyer; *provided*, that in the event Buyer determines not to maintain those records, it will arrange for the delivery of such records to a location designated by Seller.  During such period, Buyer will afford authorized representatives of Seller (including its representatives) access to such records at reasonable times and during normal business hours at its  office in New Jersey, or at such other location or locations at which such records may be stored or maintained from time to time, and will permit such representatives to make abstracts from, or copies of, any of such records, or to obtain temporary possession of any thereof as may be reasonably required by Seller, all at Seller's sole cost and expense.  At Seller's sole cost and expense, Buyer will cooperate with Seller in furnishing information, evidence, testimony, making employees available for such purposes and other reasonable assistance in connection with any action, proceeding, tax audit, or investigation to which Seller or any of the Owners is subject relating to the Business on or prior to the Closing.

Section 6.12.   Specific Enforcement.  Seller and Owners each acknowledge that any violation of any provision of Subsections 6.04, 6.05, 6.06 and 6.07 by it or them will cause irreparable damage to Buyer, that such damage will be incapable of precise measurement and that, as a result, Buyer will not have an adequate remedy at law to redress the harm that such violation will cause.  Therefore, in the event of any violation of any provision of Subsections 6.04, 6.05,

6.06 and 6.07, they agree that, in addition to all other remedies that Buyer may have at law or in equity, Buyer shall be entitled to injunctive relief, including, without limitation, temporary restraining orders and temporary injunctions to restrain any violation of Subsections 6.04, 6.05, 6.06 and 6.07. If a court of competent jurisdiction finds that either of them has violated any of the restrictions set forth in Subsections 6.04, 6.05, 6.06 and 6.07, then the period of all restrictions set forth in Subsections 6.04, 6.05, 6.06 and 6.07 automatically shall be extended by the number of days that the court determines there has been a violation of such restriction. In addition to other relief to which Buyer shall be entitled, Buyer shall be entitled to recover from Seller and/or Owners the costs and attorneys' fees incurred by Buyer in seeking enforcement of Subsections 6.04, 6.05, 6.06 and 6.07.

Section 6.13.   Reimbursement of Health Insurance Costs.  Buyer shall reimburse Seller each month for Seller's costs associated with maintaining health insurance for the Owners through the end of the Second Measurement Period up to Twenty-Five Thousand Dollars ($25,000) per Measurement Period.  In exchange for payments of the health insurance costs, Seller agrees to make Joseph Straining available to assist Buyer with the transition of the Business following Closing as and when reasonably requested by Buyer.

Section 6.14.   Termination of Restrictive Provisions.   The restrictions contained in Sections 6.06 and 6.07, will terminate and have no further force or effect in the event that (i) Buyer fails to make a required payment under the Note and make the related required payment into the Segregated Account or (ii) Buyer fails to reimburse Seller as set forth in Section 6.13; *provided*, that Seller shall have provided Buyer thirty (30) days written notice of the default and its intention to invoke this provision and Buyer has not made the required Note payment, made the required payment into the Segregated Account, or reimbursed Seller as provided in Section 6.13, as the case may be, within that thirty (30) day period. In the event that there is a disputed item under Section 2.02(f), and the restrictions contained in Sections 6.06 and 6.07 are terminated pursuant to the above, in the event the accountant selected in accordance with Section 2.02(f) finds in favor of Buyer, the restrictions contained in Sections 6.06 and 6.07 shall be reinstated as though they were never terminated.

Section 6.15.   Transferability.  The agreements set forth in Sections 6.04, 6.05, 6.06, and 6.07 relating to matters after the Closing Date may be assigned by Buyer in connection with any transfers of all or any portion of its business or assets, in one or a series of transactions of any form.

Section 6.16.   Use of Seller's Name.  Buyer will initially continue to use the name "Elite Personnel" in conjunction with Buyer's name in connection with the promotion and operation of the Business following Closing and will transition to the Buyer's name.  Buyer will consult with Seller prior to discontinuing the use of the name "Elite Personnel."

Section 6.17.   Amendment to Seller's Incorporation Documents.  Within ninety (90) days after Closing, Seller shall file an Amendment to its Articles of Incorporation changing Seller's name to a name not similar to Seller's name prior to Closing; provided, however, that if any of Seller's accounts receivable amounts shall remain uncollected as of the expiration of such ninety (90) day period, then such period shall be extended for a reasonable additional period of time as mutually agreed by the Parties acting in good faith.  After the Closing, Seller shall not use the

"Elite Personnel" name or any similar name for any commercial purpose other than to facilitate the collection of Seller's accounts receivable.

7.    **INDEMNIFICATION**

Section 7.01.    Indemnification by Seller.  Seller and Owners, jointly and severally shall indemnify and hold Buyer and its officers, directors, employees, agents, shareholders, and affiliates ("Affiliates"), harmless at all times from and after the date of this Agreement, against and in respect of all damages, losses, costs, and expenses (including reasonable attorneys' fees) ("collectively, "Losses") which Buyer or such Affiliates may suffer or incur in connection with any of the following matters:

(a)    Retained Liabilities.  Any and all liabilities of Seller or Owners other than Assumed Liabilities.

(b)    Breach.  The breach by Seller or Owners of any of the representations, warranties, or covenants in this Agreement or any of the agreements, documents, or instruments delivered in connection herewith by Seller or Owners.

Section 7.02.    Indemnification by Buyer.  Buyer shall indemnify and hold Seller harmless at all times from and after the date of this Agreement, against and in respect of all damages, losses, costs, and expenses (including reasonable attorneys' fees) which Seller may suffer or incur in connection with any of the following matters:

(a)    Assumed Liabilities.  Any Assumed Liabilities.

(b)    Breach.  The breach by Buyer of any of its representations, warranties, or covenants in this Agreement or any of the agreements, documents, or instruments delivered in connection herewith by Buyer.

Section 7.03.    Limitations of Indemnification Obligations.

(a)    Insurance Proceeds.  An indemnified party's indemnifiable losses shall be computed net of any amounts recovered or recoverable by it under third-party insurance policies or under rights of indemnity provided by third parties with respect to amounts otherwise constituting an indemnifiable loss.

(b)    Survival. All of Seller's and Buyer's representations are warranties, and the other Party's right to indemnification hereunder in connection with a breach thereof, shall survive the Closing, without regard to any information or knowledge received by Buyer not specifically set out in this Agreement, and will terminate thirty (30) days after the final scheduled payment date of the Note; _provided_, that (i) Seller's representations and warranties under Sections 4.01, 4.02, 4.03 and 4.06 shall survive forever and Buyer may make a claim thereunder at any time, to the extent that Buyer is deprived of title to or the possession and use of any of the Purchased Assets or the Business as a result of a breach thereof; (ii) Buyer's representations and warranties under Sections 3.01, 3.02 and 3.03 shall survive forever and Seller may make a claim thereunder at any time, to the extent that Buyer is deprived of or required to return any of the Purchase Price as a result of a breach

thereof, (iii) Seller's representations and warranties under Sections 4.04, 4.05 and 4.08 shall survive for a period ending three (3) months following the applicable statute of limitations under which a claim may be brought and Buyer may make a claim thereunder until that time, to the extent that Buyer receives a third-party claim for a matter that would constitute a breach thereof or is required to pay an amount to a third-party as a result of a breach thereof.

(c)     Right of Set Off.  All payments to be made by Buyer under the Note are intended to secure the indemnification obligations of the Seller under this Agreement. Accordingly, the Buyer shall be entitled to set off any amounts owing under the Note against amounts owed by Seller under this Article 7 (or otherwise from Seller); provided, however, that the Buyer shall not set off any amounts under the Note that relate to the NJ Tax Notice unless and only to the extent that any amounts due by Buyer in connection with the NJ Tax Notice exceed the Escrowed Funds.  Buyer may set off and apply the NJ Tax Escrow to Losses that relate to the NJ Tax Notice.

(d)     Indemnification Limits.  The cumulative aggregate maximum liability for indemnification claims for breaches of representations and warranties under this Agreement for Buyer, and for Seller and Owners together, shall be limited to Two Million Dollars ($2,000,000.00); *provided*, that in the event that the breach of representation or warranty either (i) was willful or amounted to fraud, or (ii) was of Seller's representations and warranties under Sections 4.01, 4.02, 4.03 or 4.06 and Buyer is deprived of title to or the possession and use of any of the Purchased Assets or the Business as a result of a breach thereof; or (iii) relates to the NJ Tax Notice, no limitation shall apply.  Any indemnification obligations set forth herein shall apply only if the Closing occurs, and then, if for breaches of representations and warranties under this Agreement, only after the aggregate amount of such indemnification obligations exceeds ten thousand dollars ($10,000), at which time, the indemnification obligations shall be effective only as to amounts exceeding ten thousand dollars ($10,000).  No threshold or limitation shall apply to indemnification obligations arising from breaches of covenants or from liabilities described in Sections 7.01(a) and 7.02(a).

Section 7.04.   Third Party Claims.  If a claim by a third party is made against any of the indemnified parties, and if any of the indemnified parties intends to seek indemnification with respect to such claim under this Article, such indemnified party shall promptly notify the indemnifying party of such claim.  The indemnifying party shall have thirty (30) days after receipt of the above-mentioned notice to undertake, conduct, and control, through counsel of such party's own choosing (subject to the consent of the indemnified party not to be unreasonably withheld) and at such party's expense, the settlement or defense of it, and the indemnified party shall cooperate with the indemnifying party in connection with such efforts; provided that (i) the indemnifying party shall not by this Agreement permit to exist any lien, encumbrance, or other adverse charge upon any asset of any indemnified party and (ii) the indemnifying party shall permit the indemnified party to participate in such settlement or defense, through counsel chosen by the indemnified party, provided that the fees and expenses of such counsel shall be borne by the indemnified party for the full amount of any loss resulting from such claim and all related expense incurred by the indemnified party pursuant to this Article.  So long as the indemnifying party is reasonably contesting any such claim in good faith, the indemnified party shall not pay or settle

18

any such claim.  If the indemnifying party does not notify the indemnified party within thirty (30) days after receipt of the indemnified party's notice of a claim of indemnity under this Article that such party elects to undertake the defense of such claim, the indemnified party shall have the right to contest, settle, or compromise the claim in the exercise of the indemnified party's exclusive discretion at the expense of the indemnifying party.

### 8.   TERMINATION

Section 8.01.   <u>Termination</u>.   This Agreement may be terminated at any time prior to the Closing:

(a)   by the mutual written consent of Seller and Buyer;

(b)   by Buyer by written notice to Seller if:

(1)   there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in <u>Section 5.02</u> and such breach, inaccuracy or failure is incapable of being cured by September 24, 2012, or, if capable of being so cured, has not been cured by Seller within ten (10) business days of Seller's receipt of written notice of such breach, inaccuracy or failure from Buyer; *provided*, that there is not then a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant this Agreement that would give rise to the failure of any of the conditions specified in <u>Section 5.03</u>; or

(2)   any of the conditions set forth in <u>Section 5.02</u> shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by September 24, 2012 unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing.

(c)   by Seller by written notice to Buyer if:

(1)   there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in <u>Section 5.03</u> and such breach, inaccuracy or failure is incapable of being cured by September 24, 2012, or, if capable of being so cured, has not been cured by Buyer within ten (10) days of Buyer's receipt of written notice of such breach, inaccuracy or failure from Seller; *provided*, that there is not then a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant this Agreement that would give rise to the failure of any of the conditions specified in <u>Section 5.02</u>; or

(2)   any of the conditions set forth in <u>Section 5.03</u> shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by September 24, 2012, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)      by Buyer or Seller in the event that (i) there shall be any law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or (ii) any governmental authority shall have issued a governmental order restraining or enjoining the transactions contemplated by this Agreement, and such governmental order shall have become final and non-appealable.

Section 8.02.   <u>Effect of Termination</u>.   In the event of termination of this Agreement in accordance with <u>Section 8.01</u> above, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except that nothing herein shall relieve any Party from liability for any willful breach of any provision of this Agreement.

## 9.      MISCELLANEOUS

Section 9.01.   <u>Notices</u>.   Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed to have been given, when received, if personally delivered or sent by confirmed email, and, when deposited, if placed in the United States mail for delivery by registered or certified mail, return receipt requested, postage prepaid, or if sent by overnight courier, addressed at the addresses set forth below.   Addresses may be changed by written notice given pursuant to this Section, however any such notice shall not be effective, if mailed, until three (3) working days after depositing in the United States mail or when actually received, whichever occurs first.

| Notices to: | Buyer: | Peoplelink, LLC |
| --- | --- | --- |
| | | 431 East Colfax Avenue |
| | | Suite 200 |
| | | South Bend, IN 46617 |
| | | Attn:  William J .Wilkinson |
| | | jwilkinson@peoplelinkstaffing.com |
| | COPY TO: | Barnes & Thornburg LLP |
| | | 600 1st Source Bank Center |
| | | 100 North Michigan |
| | | South Bend, IN 46601 |
| | | Attn:  Peter G. Trybula |
| | | Peter.Trybula@btlaw.com |
| | SELLER: | Elite Personnel Inc. |
| | | 933 Route 23 South |
| | | Pompton Plains, New Jersey 07444 |
| | | Attn: Joseph G. Straining, President |
| | | jstraining@eliteperson.com |
| | COPY TO: | Kranjac Manuali & Viskovic LLP |
| | | 30 Wall Street, 12th Floor |
| | | New York, NY 10005 |
| | | Attn:  Mario Kranjac |
| | | mkranjac@kmvllp.com |

Section 9.02.   Severability. If any term of this Agreement is deemed unenforceable, void, voidable, or illegal, such unenforceable, void, voidable, or illegal term shall be deemed severable from all other terms of this Agreement which shall otherwise continue in full force and effect.

Section 9.03.   Counterparts. This Agreement may be executed in counterparts and by different Parties on different counterparts with the same effect as if the signatures thereto were on the same instrument. A facsimile or other electronic transmission copy of the signatures to this Agreement shall be deemed originals.

Section 9.04.   Headings; Joint Drafting.   The descriptive headings contained in this Agreement are inserted for convenience only and do not constitute a part of this Agreement. This Agreement has been prepared jointly by the Parties and their respective advisors and shall not be strictly construed against either Party.

Section 9.05.   Expenses.   Except as otherwise provided herein, each Party to this Agreement shall each bear and pay for its own costs and expenses incurred by it or on its behalf in connection with the transaction contemplated hereby, including, without limitation, all fees and disbursements of lawyers, accountants, and financial consultants incurred through the Closing Date.

Section 9.06.   Brokers' Commissions.   Seller and Buyer represent and warrant to the other that it has not engaged any broker or finder in connection with the transaction described herein, other than Seller's engagement of R.A. Cohen Consulting. Seller is solely responsible for the fees and expenses of R.A. Cohen Consulting and will indemnify and hold harmless Buyer from and against any claim by or related to the involvement of R.A. Cohen Consulting in the transactions contemplated by this Agreement.

Section 9.07.   Entire Agreement; Modification and Waiver.   This Agreement, together with the Schedules attached hereto, and the related written agreements specifically referred to herein, represent the entire agreement among the Parties concerning the subject matter hereof and supersedes all prior agreements, whether written or oral, relating hereto.   No purported amendment, modification, or waiver of any provision hereof shall be binding unless set forth in a written document signed by all Parties.

Section 9.08.   Governing Law.   This Agreement and the legal relations between the Parties shall be governed by and construed in accordance with the laws of the State of New Jersey. The Parties hereby submit to the personal jurisdiction of the courts of the State of New Jersey.

Section 9.09.   Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the Parties and their successors or assigns, but may not be assigned by either Party without the prior written consent of the other Party.

Section 9.10.   Publicity.   The Parties shall not make any public announcement or release any information with respect to this transaction prior to Closing, without the written consent of the other Party.

Each of the Parties has caused this Agreement to be executed in the manner appropriate to each, all as of the day and year first written above.

**BUYER:**                              PEOPLELINK, LLC

                                        By: _____
                                              William J. Wilkinson, President


**SELLER:**                             ELITE PERSONNEL INC.


                                        By: _____
                                              Joseph G. Straining, President


**OWNERS:**

                                        _____
                                        Joseph G. Straining


                                        _____
                                        Barbara Straining

Each of the Parties has caused this Agreement to be executed in the manner appropriate to each, all as of the day and year first written above.

**BUYER:**                              PEOPLELINK, LLC

                                        By: _____
                                            William J. Wilkinson, President


**SELLER:**                             ELITE PERSONNEL INC.

                                        By *Joseph G. Straining, President*
                                           Joseph G. Straining, President


**OWNERS:**

                                        *Joseph G. Straining*
                                        Joseph G. Straining

                                        *Barbara Straining*
                                        Barbara Straining

EXHIBIT A

FORM OF NOTE (with guaranty)

[See Next Page.]

<u>EXHIBIT A</u>

PROMISSORY NOTE

$2,520,000.00

South Bend, Indiana
September [10], 2012

For value received, **PEOPLELINK LLC**, an Indiana limited liability company, having an address at 431 East Colfax Avenue, Suite 200, South Bend, IN 46617 ("Buyer") promises to pay to the order of **ELITE PERSONNEL, INC.**, a New Jersey corporation, having an address at 933 Route 23 South, Pompton Plains, New Jersey 07444 ("Seller") the sum of Two Million Five Hundred Twenty Thousand and 00/100ths Dollars ($2,520,000.00) together with interest thereon prior to maturity at the rate of three percent (3.00%) per annum, payable at such location as Seller shall designate in writing from time to time hereafter; provided, that the principal amount hereof may be reduced or increased in accordance with the provisions of Section 2.02 of the Asset Purchase Agreement entered into between Seller and Buyer, dated September [10], 2012 (the "Purchase Agreement").

Principal shall be paid in eight (8) equal quarterly installments of Three Hundred Fifteen Thousand and 00/100ths Dollars ($315,000.00). The first installment is due May 25, 2013 and the remaining seven (7) equal quarterly installments will be due thereafter on the immediately following twenty-fifth day of August, November, February and May, until all remaining principal under this Note shall be paid. Buyer may prepay the unpaid principal balance of this Note, in whole or in part, at any time or from time to time without premium or penalty. Interest shall be paid annually, on the dates the fourth and eighth installments of principal are payable.

Any of the following shall constitute an event of default under this Note: (i) the failure of Buyer to make a payment hereunder (or, in accordance with Section 2.02(e) of the Purchase Agreement, deposit in a separate account (the "Segregated Account") any proposed adjustment amount as to which Seller has timely objected) within ten (10) business days of the date such payment is due; (ii) the filing of any petition or the commencement of any proceeding voluntarily by Buyer for any relief under any bankruptcy or insolvency laws or any law relating to the relief of debtors or the consent by Buyer to the entry of any order in an involuntary case; or (iii) the entry of an order or decree by a court of competent jurisdiction in any involuntary case, that is for the relief against Buyer under any bankruptcy or insolvency laws or any law relating to the relief of debtors which is not dismissed within thirty (30) days.

Upon an event of default hereunder, Seller shall provide Buyer with written notice of default, and if Buyer fails to cure such default within ten (10) business days after receiving Seller's notice, all of the indebtedness evidenced hereby and remaining unpaid shall, at the option of Seller, become immediately due and payable with attorneys' fees and costs incurred by Seller in enforcing this Note. Any overdue principal of this Note shall, from and after the tenth (10) day after such amount is due, bear interest at a default rate of three percent (3.00%) per annum over the non-default rate of interest.

At all times, Buyer shall have the right to offset against any amounts currently due and owing or hereafter arising under the terms of this Note, any full or partial amount owed to Buyer by Seller at any time under the terms of the Purchase Agreement and all related agreements contemplated by the Purchase Agreement; provided, however, that Buyer shall have deposited such offset amounts into the Segregated Account, which shall remain therein until such matter relating to the offset amount is resolved in accordance with the Purchase Agreement.

Buyer hereby waives presentment, demand for payment, notice of dishonor, notice of protest and protest, and all other notices or demands in connection with the delivery, acceptance, performance or default of this Note, except as herein set forth.

This Note shall be binding upon Buyer and any person claiming under or through Buyer, and shall inure to the benefit of Seller, together with its successors and assigns, including each owner and holder from time to time; *provided*, that Seller may not at any time assign any of its rights hereunder, in whole or in part, without the prior written consent of Buyer, unless such assignment is made by Seller to Joseph G. Straining and/or Barbara Straining, in which case such assignment shall not require the prior written consent of Buyer.

In case of any proceedings to collect when the principal or interest of this Note becomes due, Buyer shall be responsible for payment of all costs and expenses for collection, including reasonable attorneys' fees.

Buyer hereby waives trial by jury in any action, proceeding or counterclaim brought by any holder of this Note against the Buyer on any matter whatsoever arising out of or in any way connected with this Note.

No course of dealings between Buyer and Seller or the holder hereof or any delay on the part of Seller or the holder hereof in exercising any rights hereunder shall operate as a waiver of any rights of Seller or the holder hereof, except to the extent expressly waived in writing by Seller or the holder hereof.

Buyer hereby represents, warrants, certifies and declares that all acts, conditions and things required to be done and performed and to have happened precedent to the execution and delivery of this Note and to constitute this Note a legal, valid and binding obligation of Buyer in accordance with its terms have been done, performed and have happened in compliance with all applicable laws.

This Note shall be governed in all respects, including validity, interpretation and in fact, by the laws of State of New Jersey without regard to principles of conflicts of law.  The Buyer and Seller hereby submit to the personal jurisdiction of the courts of the State of New Jersey

"BUYER"
PEOPLELINK LLC


By: _____
        William J. Wilkinson, President


## GUARANTY

CRIT Corp., a Delaware corporation ("Guarantor"), and a Member of Buyer who will derive a financial benefit from the transactions contemplated by the Purchase Agreement, hereby unconditionally guarantees the prompt payment and performance of all of Buyer's obligations to Seller under this Promissory Note.  Guarantor's liability hereunder will not be contingent or conditioned upon Seller's pursuit of any remedies against Buyer.  The Guarantor hereby submits to the personal jurisdiction of the courts of the State of New Jersey.


"GUARANTOR"

**CRIT CORP.**

By: _____
        Gilles Tanneur, President

EXHIBIT B

ALLOCATION OF PURCHASE PRICE – IRS FORM 8594

[See Next Page.]

| Form **8594**<br>(Rev February 2006)<br><br>Department of the Treasury<br>Internal Revenue Service | **Asset Acquisition Statement**<br>Under Section 1060<br><br>► **Attach to your income tax return.**   ► **See separate instructions.** | OMB No. 1545-1021<br><br>Attachment<br>Sequence No. **61** |
|---|---|---|

| Name as shown on return<br><br>ELITE PERSONNEL INC. | Identifying number as shown on return<br><br>22-2948140 |
|---|---|

Check the box that identifies you:

☐ Purchaser   ☒ Seller

**Part I** **General Information**

| 1   Name of other party to the transaction<br><br>PEOPLELINK LLC | Other party's identifying number |
|---|---|

Address (number, street, and room or suite no.)

City or town | State | ZIP code

| 2   Date of sale<br><br>9/10/12 | 3   Total sales price (consideration)<br><br>6,400,000. |
|---|---|

**Part II** **Original Statement of Assets Transferred**

| 4   Assets | Aggregate fair market value (actual amount for Class I) | Allocation of sales price |
|---|---|---|
| Class I.......................... | $ | $ |
| Class II......................... | $ | $ |
| Class III........................ | $ | $ |
| Class IV........................ | $ | $ |
| Class V......................... | $              92,000. | $              92,000. |
| Classes VI and VII............. | $           6,308,000. | $           6,308,000. |
| Total........................... | $           6,400,000. | $           6,400,000. |

| 5   Did the purchaser and seller provide for an allocation of the sales price in the sales contract or in another written document signed by both parties?........................................ | ☒ Yes | ☐ No |
|---|---|---|
| If 'Yes,' are the aggregate fair market values (FMV) listed for each of asset Classes I, II, III, IV, V, VI, and VII the amounts agreed upon in your sales contract or in a separate written document?............... | ☒ Yes | ☐ No |

| 6   In the purchase of the group of assets (or stock), did the purchaser also purchase a license or a covenant not to compete, or enter into a lease agreement, employment contract, management contract, or similar arrangement with the seller (or managers, directors, owners, or employees of the seller)?................... | ☒ Yes | ☐ No |
|---|---|---|

If 'Yes,' attach a schedule that specifies **(a)** the type of agreement, and **(b)** the maximum amount of consideration (not including interest) paid or to be paid under the agreement. See instructions.   SEE ATTACHED

BAA For Paperwork Reduction Act Notice, see separate instructions.   Form 8594 (Rev 2-2006)

FDIZ3012L   02/22/06

| 2011 | FORM 8594, PART II, LINE 6 | PAGE 1 |
|------|----------------------------|--------|
| CLIENT 5001 | ELITE PERSONNEL INC. | 22-2948140 |
| 8/31/12 | | 09:20AM |

NON COMPETE  —  $5,000

Page 2

Form **8594** (Rev 2-2006)   ELITE PERSONNEL INC.   22-2948140

**Part III** **Supplemental Statement** — Complete only if amending an original statement or previously filed supplemental statement because of an increase or decrease in consideration. See instructions.

7   Tax year and tax return form number with which the original Form 8594 and any supplemental statements were filed.

| 8   Assets | Allocation of sales price as previously reported | Increase or (decrease) | Redetermined allocation of sales price |
|---|---|---|---|
| Class I......... | $ | $ | $ |
| Class II......... | $ | $ | $ |
| Class III......... | $ | $ | $ |
| Class IV......... | $ | $ | $ |
| Class V......... | $ | $ | $ |
| Classes VI and VII......... | $ | $ | $ |
| Total........... | $ | | $ |

9   Reason(s) for increase or decrease. Attach additional sheets if more space is needed.

FDIZ3012L   02/22/06

Form **8594** (Rev 2-2006)

EXHIBIT C

FORM OF OFFICER'S CERTIFICATES

[See Next Page.]

## EXHIBIT C

## OFFICER CERTIFICATE

I, Joseph G. Straining, do hereby certify that I am duly elected and qualified as the President of Elite Personnel Inc., a New Jersey corporation (the "Company"); and that as such, I am authorized to execute this Certificate on behalf of the Company.  I further certify that:

1.      The representations and warranties of the Company contained in the Asset Purchase Agreement, and related exhibits, schedules, and documents, dated September 10, 2012, are true, accurate and correct in all material respects as of the date of closing, September 10, 2012, and all conditions contained therein have been fulfilled (unless disclosed to be incapable of fulfillment in such schedules and exhibits) as of September 10, 2012.

Dated the 10th day of September, 2012.

_____
Joseph G. Straining

## OFFICER CERTIFICATE

I, Barbara Straining, do hereby certify that I am duly elected and qualified as the Secretary of Elite Personnel Inc., a New Jersey corporation; and that as such, I am authorized to execute this Certificate on behalf of the Company.  I further certify that:

1.      Attached hereto as <u>Exhibit A</u> is a true, correct and complete copy of the Certificate of Existence for the Company as issued by the Secretary of State of New Jersey and dated September 4, 2012;

2.      Attached hereto as <u>Exhibit B</u> is a true, correct and complete copy of the Articles of Incorporation of the Company.  Such Articles of Incorporation have not been amended or superseded and remain in full force and effect on the date hereof;

3.      Attached hereto as <u>Exhibit C</u> is a true, correct and complete copy of the By-laws of the Company and all amendments thereto as are in full force and effect on the date hereof;

4.      Attached hereto as <u>Exhibit D</u> is a true, correct and complete copy of the resolutions duly adopted on the 10th day of September, 2012 by the Board of Directors of the Company and the Shareholders of the Company, authorizing the Company to enter into that certain Asset Purchase Agreement among Peoplelink, LLC an Indiana limited liability company ("Peoplelink") the Company and certain other parties thereto, and the consummation of the transactions contemplated thereby, pursuant to which Peoplelink shall purchase substantially all of the assets of the Company ("Asset Purchase Agreement"). Such resolutions have not been amended or superseded and remain in full force and effect on the date hereof;

5.      The person listed below: i) has been duly elected as an officer of the Company; ii) now holds the position listed below his/her name; iii) is currently serving in such capacity; and iv) individually is authorized to execute the Asset Purchase agreement and related documents on behalf of the Company.  The signature of such person set forth opposite his name is his/her true and genuine signature.

<u>Name and Position</u>                          <u>Signature</u>

Name: Joseph G. Straining
Office: President                         _____

Dated the 10th day of September, 2012.

By: _____
    Barbara Straining, Secretary

## **EXHIBIT A**

Certificate of Existence

**EXHIBIT B**

Articles of Incorporation

## **EXHIBIT C**

By-laws

# EXHIBIT  D

Board/Shareholder Resolutions

EXHIBIT D

FORM OF EMPLOYMENT AGREEMENT

[See Next Page.]

SBDS02 433571v8

27

**EXHIBIT D**

**EMPLOYMENT AGREEMENT**

In consideration of PEOPLELINK, LLC, an Indiana limited liability company (the "Company") employing or continuing to employ _____ (the "Employee") and other good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  **Confidential Information**.  Employee acknowledges that in the Staffing Services Business (as defined in Section 3 below), customer information developed by providers of such services, including the Company, is an extremely valuable asset which the Company treats confidentially.  Employee agrees that during the term of his/her employment and for one (1) year immediately after termination of employment, except as required by the conditions of his/her employment, Employee shall not disclose or use in any form any Confidential Information, unless authorized by the Company in writing.  Confidential Information includes all information about the Company's or its customers' business that comes to Employee's attention through his/her employment that is not generally known to or readily ascertainable by others, including, but not limited to, special staffing needs of customers, customer contacts, customer staffing history, information and authorities the Company has developed and/or compiled, financial information, business plans, pricing data, cost data, marketing software programs, margins, customer needs and requirements, and customer and prospective customer lists.

2.  **Company Property**.  Employee agrees all documents and copies of documents (and other compilations of information or data in whatever form) that s/he receives or makes in the course of his/her employment are and shall remain the property of the Company, and that Employee is to return them and any other Company property promptly at the conclusion of his/her employment or upon the Company's request, whichever occurs first.

3.  **Restrictive Covenants**.  Employee agrees that, during the period of his/her employment with the Company and for one (1) year thereafter, the Employee will not, directly or indirectly, for himself/herself or for any other person or business entity that provides the same similar services as the Company:

      (a)     Solicit, cause or authorize to be solicited, for and on behalf of himself/herself or third parties, any Staffing Services Business from any parties who are then (or had been within the prior year) customers of the Company or for which the Employee had responsibility or with whom the Employee had contact during the course of employment with the Company;

      (b)     Solicit, cause or authorize to be solicited, for and on behalf of himself/herself or third parties, any Staffing Services Business from any parties who are then (or had been within the prior year) customers or prospective customers of the Company with respect to whom the Employee acquired Confidential Information from the Company;

(c)     Solicit, recruit, hire, employ, or attempt to hire, on behalf of himself/herself or third parties, any employee of the Company who is then, or within the preceding six (6) month period was, an employee of the Company; or

(d)     Use or allow to be used, for and on behalf of himself/herself or third parties, his/her name or likeness in connection with any Staffing Services Business.

As used in this Agreement, the term "Staffing Services Business" means: (i) providing employees to customers to provide staffing help services for the customer for short-term and long-term assignments; (ii) providing employees to customers under temporary to permanent arrangements for the customers to eventually hire the employees as the customers' own employees; (iii) providing prospective employees to customers for permanent placement fees; (iv) providing payroll services for customers; (v) providing executive, professional and technical employee search services and outplacement services for customers; and (vi) providing employee screening services for customers.

4.     **Non-Disparagement.**  Except as authorized in advance by the President of the Company, Employee agrees that s/he will not contact or communicate with any media regarding his/her employment, this Agreement, or his/her separation from the Company.  Further, Employee agrees that, except as required by law, Employee will not do or say anything that a reasonable person would expect at the time would have the effect of diminishing or constraining the goodwill and good reputation of the Company, its affiliated organizations, or any of its or its affiliated organizations' officers, owners, equity holders, managers, employees, agents, representatives (collectively, "Company Affiliates") or its business to any third parties. Employee will not disparage or seek to injure the reputation of the Company or the Company Affiliates and will refrain from making any negative statements about the Company's or the Company Affiliates' methods of doing business, the effectiveness of their business policies, and the quality of any of their services, products or personnel.

5.     **Statutory and Common Law Duties and Best Efforts**.  Employee understands and agrees that this Agreement is intended, among other things, to supplement the provisions of the New Hampshire or Maine Uniform Trade Secrets Acts and the duties Employee owes to the Company under the common law, including but not limited to the duties of loyalty and confidentiality, and does not abrogate any of those obligations.  Employee further agrees that, during the term of Employee's employment with the Company, s/he will devote his/her full-time, energy and best efforts to the furtherance of the business of the Company and agrees not to take any action that deprives the Company of any business opportunities or otherwise act in a manner that conflicts with the best interest of the Company or is detrimental to the business of the Company.  With the prior consent of the Company, Employee will not undertake any other business activity during the term of his employment with the Company.

6.     **Injunctive Relief, Jurisdiction and Venue**.  Employee agrees that violation or a threatened violation of this Agreement will cause the Company to suffer irreparable harm, and the Company will not have an adequate remedy at law.  Therefore, in addition to its other remedies, the Company is entitled to injunctive relief, including temporary restraining orders and/or preliminary or permanent injunctions. Employee agrees that no injunction bond shall be necessary to secure entry of any order of injunction.  Employee also agrees to submit to jurisdiction before any state or federal court in Indiana, or in the state and county in which the

violation may occur, at the election of the Company, and Employee waives any right to raise questions of personal jurisdiction or venue in any action the Company may bring against Employee in any such court.

7.    **Extension of Restrictive Period**.    The restrictive period set forth in this Agreement shall not expire and shall be tolled during any period in which the Employee is in violation of any of the restrictive covenants set forth in <u>Sections 1, 2, 3 and 4</u> of this Agreement and all restrictions shall automatically be extended by the period the Employee was in violation of any such restrictions.

8.    **Costs and Attorneys' Fees**.    In addition to the other relief to which it may be entitled in an action to enforce this Agreement or to recover for Employee's breach of this Agreement, the Company is entitled to recover from Employee its costs and reasonable attorneys' fees, in such proceedings whether judicial or administrative.

9.    **Employment Status**.    Employee understands that this Agreement does not in any way affect his/her status as an at-will employee. Employee further understands that, as an at-will employee, Employee's employment may be terminated by the Company at any time for any reason, or no reason whatsoever, with or without cause, and without notice.

10.    **Severability/Modification of Restrictions**.    Should any clause, portion or paragraph of this Agreement be found unenforceable or invalid for any reason, the enforceability of the remainder of the provisions shall not be affected. The Company and the Employee have attempted to limit Employee's ability to compete only to the extent necessary to protect the Company and/or its affiliates from unfair competition. The parties agree that, if the scope or enforceability of the covenant not to compete is in any way disputed at any time, the trier of fact may modify and enforce the covenant to the extent that it believes to be reasonable under the circumstances existing at the time.

11.    **Successors and Assigns**.    The terms and conditions of this Agreement shall inure to the benefit of and may be enforced by, any and all successors and assigns of the Company, including without limitation by asset assignment, stock sale, merger, consolidation or other corporate reorganization, and shall be binding on Employee, Employee's heirs, executors, administrators, personal representatives, or other successors in interest.

12.    **Governing Law**.    This Agreement and any action to enforce it shall be governed by the laws of the State of Indiana.

13.    **Entire Agreement, Modifications**.    Employee understands this Agreement sets forth certain terms and conditions pursuant to which s/he will be employed by the Company and that it constitutes the entire agreement between the Company and Employee on those matters. However, Employee understands that not all of the rules and policies applicable to his/her employment are contained in this Agreement and understands and agrees to abide by any other rules and policies that the Company currently has, or may adopt, announce, amend or implement from time to time during Employee's employment. The Company and Employee agree that no amendment to or modification of this Agreement shall be effective unless it is in writing and signed by the Company and Employee

- 3 -

14. **Survival of Obligations**.  Employee acknowledges and agrees that Employee's obligations under this Agreement, including, without limitation, Employee's confidentiality and non-competition obligations, shall survive the termination of Employee's employment with the Company, whether or not such termination is with or without cause or whether or not it is voluntary or involuntary.  Employee further acknowledges and agrees that no material or other breach of any contractual or legal duty by the Company shall be held sufficient to excuse or terminate Employee's obligations under this Agreement or to preclude the Company from obtaining injunctive relief

15. **Cumulative Remedies**.  Employee acknowledges and agrees that Company's rights under this Agreement shall be cumulative and additional to all other or further remedies the Company may have in law, equity or under contract.

16. **Non-Waiver.**  The failure of the Company to insist in any one or more instances upon full performance of any of the provisions of this Agreement or to pursue its rights hereunder shall not be construed as a waiver of any such provisions or the relinquishment of any such rights.

PEOPLELINK, LLC

By:_____

Signature of Employee

_____

(Printed)

_____

(Printed)

Title _____

Date:_____

Date:_____